# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| **TOWN OF SMYRNA, TENNESSEE,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 3:11-0642** |
| | ) | **Judge Sharp** |
| **THE MUNICIPAL GAS AUTHORITY** | ) | |
| **OF GEORGIA,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM

Pending before the Court are Defendant Municipal Gas Authority of Georgia's ("Gas Authority's" or "Authority's") Motion to Transfer, Dismiss, or Abstain (Docket No. 19), Motion to Transfer, Dismiss, or Abstain With Respect to Plaintiff's First Amended Complaint (Docket No. 32), and Motion to Dismiss Based on the Doctrine of Sovereign Immunity (Docket No. 40). Not counting the filings made with respect to the initial Motion to Transfer, Dismiss, or Abstain, which has been mooted by the filing of the same motion in relation to Plaintiff's Amended Complaint, the parties have filed more than 150 pages of argument in relation to their respective positions on the issues presented by the Motions. For the following reasons, Defendant's Motions will be denied.

## I. FACTUAL ALLEGATIONS[1] AND PROCEDURAL BACKGROUND

Plaintiff, the Town of Smyrna, Tennessee ("Smyrna" or "the Town") is a municipal corporation that owns and operates a system for the distribution of natural gas to customers within its service area. Defendant Gas Authority was formed in 1987 by an Act of the Georgia General

---

[1] The factual allegations are drawn primarily from the Amended Complaint filed in this Court, as well as a declaratory judgment complaint filed in a Georgia state court which is discussed *infra*.

Assembly, and "is the largest non-profit natural gas joint action agency in the United States" with 78 members, 64 of which are in Georgia, and two of which are Tennessee municipalities, including Smyrna. (Amended Complaint, Docket No. 25 ¶ 2). It was created "to assist in providing reliable and economic gas supplies to member municipalities who own and operate natural gas distribution systems." (Id.).

In March 2000, Smyrna and the Gas Authority entered into a Supply Contract whereby the Authority agreed to supply and manage Smyrna's natural gas requirements. Two years later, in March 2002, the Gas Authority offered its members a "Hedging Program" that allowed a member to have the Gas Authority hedge prices on the member's behalf for certain agreed-upon monthly volumes of natural gas.

Under the Hedging Program, three options were provided: Option 1, No Hedging; Option 2, Price Hedging with Gas Authority Decision Making; and Option 3, Price Hedging with Customer Decision Making. The Memorandum from the Gas Authority detailing the Hedging Program indicated that the customer was to designate the target quantity to be hedged at the start of each 12 month period, and the option elections and target volumes were to be reviewed annually.

At some point prior to September 9, 2003, the Gas Authority prepared and forwarded to Smyrna an "Alternative Price Agreement," which the Town approved and returned. The Alternative Price Agreement provided that "the Gas Authority shall execute hedges on behalf of a Customer for a period of no more than 24 months from the date of any such execution based on the monthly Hedge Program Quantity identified by Customer . . . " and that "[t]he Hedge Program Quantity so defined shall remain in effect until Customer provides written notice to the Gas Authority of its intent to modify the Hedge Program Quantity or exit the program." (Id. ¶ 11).

In October 2005, the parties entered into a new supply contract in which the Gas Authority agreed to use its best efforts to supply Smyrna's natural gas requirements. The Gas authority also agreed to charge Smyrna and other members according to "'a fair and nondiscriminatory pricing mechanism' in an amount sufficient to cover [the Gas Authority's] costs in providing such services, with excess in annual revenues returned to members and the members being subject to an assessment if there is a deficiency in revenue to cover costs." (Id. ¶ 18). Smyrna was to be billed by the Gas Authority monthly, and, in the case of billing disputes, was to pay the monthly bill under protest.

On September 14, 2007, in accordance with a "Hedging Authorization" form created by the Gas Authority, Smyrna authorized the Gas Authority to execute hedges for a portion of its natural gas supply needs under Option 2 for the November 2008 to March 2009 heating season, and kept the hedge volumes the same as they were for the 2007-2008 heating season. Then, in March 2009, Smyrna notified the Gas Authority that it wanted to reduce the hedge volumes for the 2009-2010 heating season, a proposal which the Gas Authority allegedly accepted on July 20, 2009.

Because the price of natural gas declined through the 2009-2010 heating season, Smyrna informed the Gas Authority in February 2010 that it wanted to further decrease the volume of the gas to be purchased under Option 2 of the Hedging Program for the 2010-2011 heating season. In response, the Gas Authority informed Smyrna that it would not be permitted to reduce its volumes in the amount requested, and that the Gas Authority "had executed 100% of the hedges for the program participants in late 2008 and that the participants were obligated to accept those prices and the volumes required by" the Authority. (Id. ¶ 30). Although the Gas Authority agreed to partially reduce the hedge volumes for the 2010-2011 heating season, the volumes were significantly higher than that allegedly authorized by the Town.

Smyrna voiced its objections and informed the Authority that, if it did not agree to the reduction in volume requests, the Town wanted to "opt out of Option 2 of the Hedging Program and to make any hedges at its own discretion." (Id. ¶ 33). In response, the Gas Authority informed Smyrna that it had already hedged specific volumes of gas for Smyrna through the 2013-2014 heating season.

Smyrna claims the Authority billed the Town for unauthorized volumes of hedging for both the 2009-2010 and 2010-2011 heating seasons, and the Town has paid (under protest) hedge charges totaling more than $1.5 million for November 2010 through March 2011. Contending that the Gas Authority had no authority from the Town to execute hedges on Smyrna's behalf for five years, Smyrna filed suit in this Court alleging breach of contract, breach of contract implied in fact, breach of fiduciary duty, unjust enrichment, and violation of the Tennessee Consumer Protection Act ("TCPA"), Tenn. Code Ann. §§ 47-18-101 *et seq.*

In response, the Gas Authority filed a declaratory judgment action in the Superior Court of Fulton County, Georgia on July 15, 2011. In the Georgia action, the Authority alleged that Smyrna and numerous other municipalities entered into contractual arrangements with the Gas Authority for their natural gas supply and that, on September 14, 2008, Smyrna became an Option 2 participant which allowed it to change its election, except as to hedges that were already in place. The Authority alleges Smyrna wanted to be excused from its contractual obligations because the price of natural gas had dropped, even though hedges had already been placed by the Gas Authority. The Gas Authority requested that the Superior Court "enter a declaratory judgment validating the existing contractual relationship between the parties and declaring that [the Town] is obligated to continue paying pursuant to its contract for its gas bought under its contract whether through the

hedging program or otherwise [.]" (Docket No. 21-8, at 4).

On July 28, 2011, the Georgia action was removed to the United States District Court for the Northern District of Georgia, whereupon the Town filed a Motion to Transfer or Stay, and the Gas Authority filed Motions to Remand to the Fulton County Superior Court. On March 27, 2012, Chief Judge Carnes granted Plaintiff's request to stay under the "first filed rule,"and denied the Authority's request that the case be remanded to state court. <u>Mun. Gas Auth. of Georgia v. Smyrna</u>, 2012 WL 10368649 (N.D. Ga. March 27, 2012).[2] That action was then administratively closed.

## II. <u>LEGAL DISCUSSION</u>

As noted at the outset, the Authority moves to dismiss, transfer or abstain, and also moves to dismiss on sovereign immunity grounds. Because the latter motion goes to this Court's power to hear the case, the Court considers it first. <u>See</u>, <u>Miller v. City of Cincinnati</u>, 622 F.3d 524, 531 (6th Cir. 2010) (citation omitted) ("whether a federal court has the power to adjudicate a suit, is 'the threshold question in every federal case'").

### A. <u>Motion to Dismiss Based on the Doctrine of Sovereign Immunity</u>

The Authority's sovereign immunity argument[3] is grounded on the recent decision of the Georgia Supreme Court in <u>Kyle v. Georgia Lottery Corp.</u>, 718 S.E.2d 801 (Ga. 2011), which held that the Georgia Lottery Corporation ("GLC") is entitled to sovereign immunity under Georgia law.

---

[2] As Judge Carnes explained, "[u]nder the first-filed rule, 'where two actions involving overlapping issues and parties are pending in two federal courts, there is a strong presumption across the federal circuits that favors the forum of the first-filed suit.'" (<u>Id</u>. at 5 quoting, <u>Manuel v. Convergys Corp.</u>, 430 F.3d 1132, 1135 (11th Cir. 2005)).

[3] The Authority's sovereign immunity argument is necessarily directed solely at Smyrna's claims that are not based upon a written contract because the Georgia Constitution specifically provides that "[t]he state's defense of sovereign immunity is hereby waived as to any action <i>ex contractu</i> for the breach of any written contract now existing or hereafter entered into by the state or its departments or agencies." GA. CONST. Art. I, Sec. II, Para. IX(c).

Quoting and focusing on <u>Kyle</u>'s introductory language on sovereign immunity, the Authority argues that the Georgia Supreme Court's opinion "is to be given great deference by this Court in determining whether the Gas Authority is likewise entitled to sovereign immunity." (Docket No. 41 at 6).[4]

In <u>Kyle</u>, the Georgia Supreme Court began its substantive discussion of the sovereign immunity issue by stating: "Because sovereign immunity applies to state instrumentalities, GLC is entitled to assert sovereign immunity as a defense in this case." <u>Kyle</u>, 718 S.E.2d 802. The court cited for that proposition its earlier decisions in <u>Miller v. Georgia Ports Auth.</u>, 470 SW.3d 426 (Ga. 1996) and <u>Youngblood v. Gwinnett Rodal Newton Comm. Serv. Bd.</u>, 545 S.E.2d 875 (Ga. 2001).

In <u>Miller</u>, the Georgia Supreme Court found that "[a]s the state administrative unit responsible for the state docks, the Georgia Ports Authority is a state agency entitled to sovereign immunity." <u>Miller</u>, 470 S.E.2d at 587. Building on <u>Miller</u> which "look[ed] to the legislation creating the Georgia Ports Authority and the public purposes for which it was created," the Georgia Supreme Court in <u>Youngblood</u> held that community service boards were departments or agencies of the state entitled to sovereign immunity, writing:

> Applying the <u>Miller</u> analysis, a review of the law creating and defining community service boards clearly establishes that such boards are departments or agencies of the State charged with the public purpose of providing mental health care and services to the disabled citizens of this State. Community service boards were created by the General Assembly as "public agencies" to govern publicly funded programs which provide mental health, mental retardation, substance abuse, and other disability services. OCGA § 37-2-6(a). See OCGA §§ 37-2-1(a), (b), 37-2-11(a). The boards were established on a multi-county level to provide, inter

---

[4] "This is confirmed," the Authority insists, "by the Sixth Circuit in <u>Long v. Richardson</u>, 525 F.2d 74 (6th Cir. 1974)," (<u>id</u>.), which held that Memphis State University was entitled to sovereign immunity pursuant to the Tennessee Supreme Court's decision in <u>Applewhite v. Memphis State University</u>, 495 S.W.2d 190, 196 (1983). However, the deference afforded in <u>Long</u> was based upon "a square state adjudication by the state's highest court," <u>Long</u>, 525 F.2d at 7, something that does not exist in this case.

alia, "continuity of care through integration of county, area, regional, and state services and facilities for the disabled." OCGA § 37-2-1(c). See OCGA § 37-2-6(a). Considering the public purpose for which community service boards were created, we find that the [Community Service Board] is a "state department or agency" entitled to raise the defense of sovereign immunity under Article I, Section II, Paragraph IX of the Georgia Constitution.

545 S.E.2d at 877. In an accompanying footnote, the court observed that "the administration of each community service board is governed by other State Agencies under State guidelines," including, but not limited to, the rules and regulations of the State Department of Human Resources, "the policies relating to State personnel administration," and the "State Merit System rules and regulations." Id. fn. 2.

Utilizing Miller and Youngblood as the proper "construct," the Georgia Supreme Court in Kyle held that "GLC must be classified as an instrumentality of the State to which sovereign immunity applies." Kyle, 718 S.E.2d at 803. The court then wrote:

. . . A review of the law creating GLC establishes that it is an instrumentality of the state, OCGA § 50–27–4, and that its main purpose is to generate net proceeds to be "used to support improvements and enhancements for educational purposes and programs and that such net proceeds shall be used to supplement, not supplant, existing resources for educational purposes and programs." OCGA § 50–27–2(1). Furthermore, GLC "shall be governed by a board of directors composed of seven members to be appointed by the Governor," OCGA § 50–27–5(a), and its net proceeds are distributed directly to the State treasury. OCGA § 50–27–13(b)(2). Finally, GLC is "accountable to the General Assembly and to the public through a system of audits and reports." OCGA § 50–27–2(4).

Id. Citing Miller, the Kyle court concluded its sovereign immunity by stating "[t]herefore, the purpose, function, and management of GLC are indelibly intertwined with the State in a manner that qualifies it for the protection of sovereign immunity as a State instrumentality." Id.

Notwithstanding the fact that the Georgia legislature "created a public body corporate and politic to be known as the Municipal Gas Authority of Geogia, which shall be a public corporation

of the state of Georgia," and which "shall not be a political subdivision of the state but shall be an instrumentality of the state," OCGA § 46-4-82, this Court concludes – based upon the trilogy of cases beginning with <u>Miller</u> and ending with <u>Kyle</u> – that the Gas Authority's purpose, function, and management is not indelibly intertwined with the state, so as to qualify it for the protection of sovereign immunity.

Unlike the GLC, the Authority's purpose, function and management are detached from the State of Georgia. Whereas the GLC is authorized by the Georgia Constitution and was enacted to benefit educational programs for Georgia students with the General Assembly to "appropriate all net proceeds of the lottery . . . to educational programs and educational purposes," GA. CONST. Art. I, Sec. II, Para. VIII(d), the Authority's express purpose is to provide a supply of gas to voluntarily-participating political subdivisions, including political subdivisions outside the state of Georgia. <u>Id</u> § 46-4-96(a)(5) and (a)(7). The Authority is authorized to act "as an agent for such political subdivisions," and to provide services "to and for the benefit of the political subdivisions," O.C.G.A. §§ 46-4-96(a)(5), (a)(13), not to benefit the state as a whole. This point is underscored by the Gas Authority's mission statement which reads: "To provide municipalities a reliable, economical supply of natural gas and to assist them in developing and growing their gas systems to optimize the benefits of public ownership." Mission Statement, [www.gasauthority.com](www.gasauthority.com), last visited April 15, 2012. Thus, unlike the GLC which exists to provide education funding for Georgia students generally, the Gas Authority serves local governments by providing member municipalities with natural gas.

Also, and unlike the GLC which is "governed by a board of directors . . . to be appointed by the Governor," O.C.G.A. § 50-27-5(a), the Gas Authority is governed by representatives, who are

elected by the municipalities, and who serve at the pleasure or the municipalities. Id. §§ 46-4-83 to 46-4-89. The Gas Authority also makes its own rules and regulations for its own governance, id. § 46-4-92, selects its staff and fixes their compensation, id., §§ 46-4-92 & 96(a)(4), and has the option "[t]o exercise any one or more of the powers, rights and privileges. . . either alone or jointly or in common with one or more other parties or utilities, whether public or private." Id. § 46-4-96(a)(8).

Additionally, and again unlike the GLC, the Gas Authority is relatively free from state financial oversight. The Gas Authority, as a "distinct corporate entity" is exempt from the Georgia State Financing and Investment Commission Act. Id. § 46-4-82(a). It is required to exercise financial prudence and to "fix the rates, fees, and charges . . . such as will produce revenues only in amounts sufficient . . . to pay the principal or purchase price of and premium, if any, and interest on bonds and all other indebtedness and contractual obligations of the authority . . . to provide for payment of any judgment of the authority . . . and to maintain such reserves as shall have been created in amounts sufficient in the judgment of the authority for the security of bonds and other obligations[.]" Id. § 46-4-97. In sum, the Gas Authority is, as its President and Chief Executive Officer concedes, "a non-profit entity" whose "losses or gains are passed on to its members." (Corbin Decl. Docket No. 21, ¶ 14).[5]

Given the foregoing, the Court agrees with Plaintiff that there appears to be a lack of

---

[5] In contrast, the GLC's finances are heavily regulated and subject to scrutiny by the state. The State Constitution requires that the net proceeds of the lottery "be specifically identified by the Governor in his annual budget presented to the General Assembly as a separate budget category," Ga. Const. Art. I, Sec. II, Para. VII(d), and, "[t]o ensure the financial integrity of the lottery," the implementing statute requires that the GLC "adopt a system of internal audits," maintain weekly records, and "[s]ubmit quarterly and annual reports to the Governor, state auditor, the state accounting officer, and the oversight committee[.]" O.C.G.A. § 50-77-33. Further, the GLC may enter into contracts to incur debt only with the approval of the Georgia State Financing and Investment Commission. Id. § 50-27-13(a)(10).

involvement in the Gas Authority by the State of Georgia "beyond the mere passage of the legislation creating it, and finds that Kyle and the cases upon which it was built do not support Defendant's contention that it should be afforded sovereign immunity.[6]

Quite apart from Kyle, the Authority asserts that it is entitled to Eleventh Amendment sovereign immunity. The Court disagrees.

"Immunity from suit is a fundamental aspect of the sovereignty which the States enjoy[.]" Alden v. Maine, 527 U.S. 706, 713 (1999). "For the States, that immunity flows from the nature of sovereignty itself as well as the . . . Eleventh Amendment[]," and serves "to protect the solvency and dignity of the states[.]" Lowe v. Hamilton County Dept. of Job & Family Serv.'s, 610 F.3d 321, 324 (6th Cir. 2010).

"The States' immunity from suits in federal court applies to claims against a State by citizens of the same State as well as to claims against a State by citizens of another State." Ernst v. Rising, 427 F.3d 351, 358 (6th Cir. 2005). The burden of establishing Eleventh Amendment immunity lies with the party asserting the defense. Barker v. Goodrich, 649 F.3d 428, 432 (6th Cir. 2011).

"When a claim of sovereign immunity is asserted, the inquiry turns on whether the entity 'is to be treated as an arm of the State partaking of the State's Eleventh Amendment immunity, or is instead to be treated as a municipal corporation or other political subdivision to which the Eleventh Amendment does not extend.'" Smith v. Leis, 407 Fed. Appx. 918, 923 (6th Cir. 2011) (quoting, Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 280 (1977)). Stated differently, "[t]he immunity does not attach if the lawsuit is not against the State or an 'arm of the

---

[6] In light of this conclusion, the Court does not address the Authority's arguments relating to comity and whether Georgia law applies because those arguments are premised on the conclusion that Kyle mandates the Gas Authority be granted sovereign immunity.

State.'" Ernst, 427 F.3d at 358.

On several occasions, the Sixth Circuit has set forth the factors to be considered in determining whether an entity is an arm of the state for sovereign immunity purposes. Most recently, the Sixth Circuit identified those factors as:

> (1) the State's potential liability for a judgment against the entity; (2) the language by which state statutes and state courts refer to the entity and the degree of state control and veto power over the entity's actions; (3) whether state or local officials appoint the board members of the entity; and (4) whether the entity's functions fall within the traditional purview of state or local government.

Pucci v. Nineteenth Dist. Court, 628 F.3d 752, 760 (6th Cir. 2010) (citing, Ernst, 427 F.3d 359).

Of those factors, "there can be little doubt that the state-treasure inquiry will generally be the most important one[.]" Ernst, 428 at 366. However, because "the Eleventh Amendment incorporates 'twin reasons' for granting states sovereign immunity: the desire not to infringe either a states purse or its dignity, . . . in certain cases, . . . the last three factors may demonstrate that an entity is an arm of the state entitled to sovereign immunity despite the fact that political subdivisions and not the State are potentially liable for judgments against the entity." Pucci, 628 F.3d at 761-62.

Applying the four factors identified by the Sixth Circuit, the Gas Authority has failed to show that it is entitled to Eleventh Amendment immunity.

*First*, the Authority argues that (1) "any judgment for any tort claims in this case would be paid by the State of Georgia," specifically the State Tort Claims Trust Fund; and (2) "[c]ase law confirms that such a fund is state money for Eleventh Amendment purposes." (Docket No. 41 at 10). As Plaintiff aptly observes, this argument does nothing more than beg the question as to why this would necessarily be so.

The Gas Authority's failure to answer the question it begs speaks volumes because the

Supreme Court has explained that the "proper focus" for purposes of the potential liability issues is whether the State is "in fact obligated to bear and pay" for the debt. Hess. v. Port Auth. Trans-Hudson Corp., 513 U.S. 30, 50 (1994). It does not appear that the State of Georgia would be responsible for any judgment in this case because, as already observed, the Gas Authority is required by statute to produce revenues in amounts sufficient to cover any judgment, and the Authority has already stated in this case that its members are required to bear any losses.

Moreover, in response to the Gas Authority's Motion, Plaintiff argues that the State of Georgia has expressed a disinclination to be responsible for the financial obligations of the Authority by providing that bonds or notes issued by the Authority shall not be "'a pledge of the faith and credit of the State of Georgia or any political subdivision thereof'" or "'obligate the state or any political subdivision thereof to levy or pled any form of taxation whatever for the payment thereof,'" and by providing that no Gas Authority creditor "shall have the right to enforce the payment of the bond or note against any property of the state or of any political subdivision thereof[.]" (Docket No. 45 at 20, quoting, O.C.G.A. § 46-4-115(a)). Plaintiff also asserts that in each of the last three years, the Authority "has averaged roughly $50 million in operating income," and "has nearly $154 million in cash and investment securities." (Id. at 21). Despite filing a 20 page reply brief, the Authority does not challenge any of these assertions.

Again, the critical question in relation to the financial liability prong of the immunity analysis is whether the State will be obligated to use the public coffers to pay for a debt or judgment. "When the answer is 'No' —both legally and practically—then the Eleventh Amendment's core concern is not implicated." Hess, 513 U.S. at 50. Given the record before the Court, it appears that, as both a practical and legal matter, the State of Georgia will not be liable for any judgment in this

case.

*Second*, the Authority argues that "[b]oth the state statutes creating the Gas Authority, and the Georgia Supreme Court's <u>Kyle</u> decision, confirm that Georgia's statutes and state courts treat the Gas Authority as an entity entitled to Eleventh Amendment immunity." (Docket No. 41 at 11). The Court has already expressed its opinion about the applicability of <u>Kyle</u> to the Gas Authority, and, while the statute relating to the Gas Authority is lengthy and identifies it as an instrumentality of the state, this pronouncement is watered-down by the fact that the Gas Authority does not appear to function much like a state agency at all. <u>See</u>, <u>Ernst</u>, 427 F.3d at 360 (discussing second factor in relation to Michigan's retirement system for judges and noting that "State has extensive and detailed control over the retirement system," and "[s]tate law also imposes extensive requirement with respect to the investment of, and custody over the retirement system's funds").

*Third*, the Authority argues that O.C.G.A. § 46-4-83 "points in favor of Eleventh Amendment immunity" because "it provides that the Gas Authority's board consists of nine members who are elected (not appointed)[.]" (Docket No. 41 at 13). This factor actually favors the opposite conclusion. <u>See</u>, <u>Ernst</u>, 427 F.3d at 360 (italics in original) (fact that "three of the five members of the board of the retirement system are appointed by Michigan's governor with the advice and consent of the Michigan Senate," and "[t]he other two members *are* state officials" pointed in favor of sovereign immunity).

*Fourth*, the Authority argues that it does not perform functions which fall within the traditional purview of local governments because it does not sell gas to end users, but rather "facilitates statewide and regional distribution of gas to entities that have their own distribution systems." (Docket No. 41 at 14). However, the "inquiry into the 'traditional purview' of state

government stems from the importance of dignity in the origins of [the] sovereign immunity doctrine; if the agency in question carries out a long-recognized state function, it is a particular affront to a state to subject this agency to suit." <u>Pucci</u>, 628 F.3d at 764. Unlike <u>Pucci</u> which involved a court system "mandated by the state constitution to be uniform to be supervised by one supreme court," <u>id</u>., or <u>Ernst</u> which involved a state retirement system "funded by annual appropriations from the state legislature" which "operates on a statewide basis and serves the officers of one of three essential branches of state government," <u>Ernst</u>, 427 F.3d 362, providing natural gas and related services to in- and out-of-state municipalities is hardly a "long-recognized state function," necessitating "respect for a state's dignity." <u>Pucci</u>, 628 F.3d at 764.

Accordingly, the Court finds that neither <u>Kyle</u> nor the Eleventh Amendment provide the Gas Authority with sovereign immunity.

**B.  Motion to Transfer, Dismiss or Abstain**

By way of this Motion, the Gas Authority first seeks to transfer this case to the Fulton Superior Court pursuant to a forum selection clause that was contained in the 2000 Supply Contract. Although this argument may have had some traction under the allegations in the original Complaint, the Amended Complaint does not allege any breach of that contract. Moreover, the parties agree that the 2005 Supply Contract (which has no forum selection clause) supersedes the 2000 Supply Contract.

Forum selection clause aside, the Gas Authority argues this case should be transferred to the Northern District of Georgia pursuant to 28 U.S.C. § 1404(a) which provides that "for the convenience of the parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." 28 U.S.C. § 1404(a).

A decision on whether to transfer lies within the broad discretion of the trial court.  Bunting ex rel. Gray v. Gray, 2 Fed. Appx. 443, 448 (6th Cir. 2001).

"[I]n ruling on a motion to transfer under § 1404(a), a district court should consider the private interests of the parties, including their convenience and the convenience of potential witnesses, as well as other public-interest concerns, such as systemic integrity and fairness, which come under the rubric 'interest of justice.'" Moore v. Rohm & Haas Co., 446 F.3d 643, 647 (6th Cir. 2006) (citation omitted).  Therefore, in deciding whether the present forum is inconvenient, the Court considers a number of factors, including (1) the location of willing and unwilling witnesses; (2) the residence of the parties; (3) the location of sources of proof; (4) the location of the events that gave rise to the dispute; (5) systemic integrity and fairness; and (6) the plaintiff's choice of forum. Id.; Kerobo v. Southwestern Clean Fuels, Corp., 285 F.3d 531, 537 (6th Cir. 2002).

In moving to transfer under § 1404(a), the Gas Authority argues:

.   .   .   The Gas Authority is headquartered in the Northern District of Georgia and its Members are predominantly Georgia residents. . . The Gas Authority currently consists of 78 Members, 64 of which are Georgia municipalities. . . The Gas Authority and all of its key witnesses in this matter are located in Georgia, specifically within the territory encompassing the United States District Court for the Northern District of Georgia. . . The majority of the documents and other physical evidence pertinent to this case are also located within the geographical territory of the United States District Court for the Northern District of Georgia. . . The Gas Authority's records are all located at its offices in Kennesaw, Cobb County, Georgia.

If other municipalities elect not to participate as witnesses voluntarily, a Georgia court would have the authority to compel 64 Member municipalities, who are Georgia citizens and residents, to participate. . .The only two Member municipalities located in the State  of Tennessee are the towns of Lawrenceburg and Smyrna. . . The ultimate result of this dispute would have a substantial effect on the 77 other Members of the Gas Authority, 64 of which are citizens and residents of the State of Georgia. . . Conflicting rulings from different courts interpreting the substantially-identical Gas Supply Contracts would create inconsistent obligations by the Gas Authority to its Members. . . Georgia law will apply and Georgia statutes govern the conduct of the Gas Authority.

(Docket No. 33 at 10).

Some of what the Authority relies upon can easily be turned in favor of retaining jurisdiction when those facts are viewed from Smyrna's perspective. For example, while the Gas Authority is headquartered in the Northern District of Georgia, Smyrna is located in the Middle District of Tennessee, and its choice of forum is entitled to some deference. Lewis ACB Business Servs., Inc., 135 F.3d 389, 413 (6th Cir. 1998). Likewise, while the Authority's documents are located in Georgia, Smyrna's documents are retained in this district and, in any event, "'[i]n the modern era of photocopying, scanning, fax machines, email, overnight delivery services, etc., the location of documents should be considered a neutral factor when deciding to transfer venue under § 1404(a).'" Oakley v. Remy Intern., Inc., 2010 WL 5203124 at *5 (M.D. Tenn. Feb. 5, 2010) Similarly, while the Gas Authority claims that its key witnesses are located in Georgia, the Town makes the same assertions in relation to its witnesses being in Tennessee.

On the issue of witnesses (which is often considered the most important factor in the transfer analysis, see, id. at *4), the Gas Authority claims that 64 of its members are Georgia municipalities. While that may be so, the Authority fails to present any cogent reasons why the members would be essential witnesses in what is effectively a contract dispute between it and the Town involving communications between those two parties. This is important because "[t]he determination of the convenience of witnesses is not merely a 'head count,' but includes a consideration of the importance of each witness" and whether those witnesses are "likely to testify in the case." Id. (citation omitted).

Finally, the Court is unpersuaded by the Authority's purported fear of possible inconsistent rulings, or its fear that a ruling in this case will have a "substantial effect" on its supply contracts

with other municipalities. (Docket No. 33 at 10). The former is now pretty much ameliorated by the fact that the Georgia action has been stayed in favor of this case. The latter seems unlikely because this case is grounded in the alleged communications between the parties and representations allegedly made to the Town. Smith v. Kyphon, Inc., 578 F.Supp.2d 954, 963 (M.D. Tenn. 2008).[7]

"The defendant has the burden to establish that transfer is warranted, and, in meeting that burden, it 'must show that the relevant factors weigh strongly in favor of transfer.'" Pace Indus. Union Mgmt. Pension Fund v. King, 2011 WL 1481306 at *1 (M.D. Tenn. April 18, 2011) (collecting cases). At most, the Gas Authority has shown that a couple of the factors in the transfer analysis might be evenly balance and, as such, its request for transfer will be denied.

The Authority next makes a relatively brief argument that this Court should abstain pursuant to Burford v. Sun Oil Co., 319 U.S. 315, 318 & 322 (1943), in favor of allowing this case to be adjudicated by the Fulton County Superior Court. Leaving aside that there are no pending proceedings in that court in light of the removal to the Northern District of Georgia and the latter court's denial of the Authority's Motion to Remand, Burford abstention is unwarranted.

Abstention is "an extraordinary and narrow exception to the duty of a District Court to adjudicate a controversy properly before it." Answers in Genesis of Ky., Inc. v. Creation Ministries Int'l., Ltd., 556 F.3d 459, 467 (6th Cir. 2009) (citation omitted). Nevertheless, in Burford, the Supreme Court observed that, in certain cases, abstention "further[s] the harmonious relation between state and federal authority," and that federal courts "should exercise their discretionary power with proper regard for the rightful independence of state governments in carrying out their

---

[7] Further, the fact that Georgia law *might* apply to this case is not a reason to transfer because the claims are relatively straightforward and, besides, federal courts often apply the law from outside of the jurisdiction where the court sits.

domestic policy." Burford, 319 U.S. at 318 & 322.

The Sixth Circuit has summarized Burford and its progeny as follows:

> The upshot of what has come to be known as Burford abstention is this: When a case presents an unanswered question of state law "bearing on policy problems of substantial public import whose importance transcends" the case at hand and when conflicting state and federal rulings on the question "would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern," Burford says that a district court should stay its hand until the state courts have had an opportunity to weigh in on the matter. . . The Burford doctrine thus tells federal courts when to exercise discretion (by considering whether a federal ruling might wreak havoc on a sensitive yet indeterminate area of state policy) and how to exercise that discretion (by avoiding immediate resolution of the state law issue).

Gray v. Bush, 628 F.3d 779, 784 (6th Cir. 2010) (citation omitted). Thus, "Burford abstention is a method by which federal courts may defer to the pending decision of a state agency when 'the State's interests are paramount and . . . [the] dispute would best be adjudicated in a state forum.'" Brown v. Cassens Transport Co., ___ F.3d ___, ___, 2012 WL 1139059 at *6 (6th Cir. 2012) (quoting, Quackenbush v. Allstate Ins. Co., 517 U.S. 706, 728 (1996)).[8]

As support for its position that this case must be heard in Fulton County and that Burford abstention is therefore appropriate, the Authority points to O.C.G.A. § 46-4-121(b), which provides that "[a]ny action pertaining to validation of the bonds issued under this article and pertaining to validation of the contracts constituting security for bonds shall be brought in the Superior Court of Fulton County," and "[t]hat court shall have exclusive original jurisdiction of any such action." This case, however, is not a validation proceeding within the meaning of the statute.

By its very terms, the validation statute relates to actions pertaining to the validation of the

---

[8] "When a complaint seeks only monetary damages, Burford abstention may justify a stay, though not a dismissal of the claims." Id.

bonds and to the validations of the contracts which serve as security for the bonds. This case simply does not pertain to the bonds or to the validation of the 2005 Supply Contract and, indeed, the Town makes no allegation that the Supply Contract is invalid, or that the validations proceedings involving that contract or bonds were somehow improper. In the absence of a challenge "pertaining to validation," the Authority, by statute, can "sue and be sued in contract and in tort and [can] defend in all courts." O.C.G.A. §46-4-96(a)(1). Since this litigation does not involve "a matter of substantial public concern" within the meaning of <u>Burford</u>, the Court will not abstain from hearing it.

Finally, the Gas Authority argues that each of Smyrna's claims should be dismissed for failure to state a claim. Because the Town's legal theories state plausible claims, the Authority's motion to dismiss will be denied.

As a general rule, in considering a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a court must take "all well-pleaded material allegations of the pleadings" as true. <u>Fritz v. Charter Township of Comstock</u>, 592 F.3d 718, 722 (6th Cir. 2010). The factual allegations in the complaint "need to be sufficient to give notice to the defendant as to what claims are alleged, and the plaintiff must plead 'sufficient factual matter' to render the legal claim plausible, i.e., more than merely possible." <u>Id</u>. (quoting <u>Ashcroft v. Iqbal</u>, 129 S.Ct. 1937, 1949-50 (2009)).

A claim is plausible on its face if the "plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," and this entails showing "more than a sheer possibility that a defendant has acted unlawfully." <u>Ashcroft</u>, 129 S.Ct. at 1949. Thus, "[w]hile a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of [its] entitlement

to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." <u>Bell Atlantic Corp. v. Twombly</u>, 550 U.S. 544, 555 (2007) (internal citations and quotations omitted).

The Authority moves to dismiss the breach of Supply Contract claim in Count One because Smyrna alleges "that the Gas Authority is doing what it is supposed to do under the contract," to wit, supplying the Town with reliable and economic natural gas supplies. (Docket No. 33 at 14). This is a crabbed reading of the allegations in the Amended Complaint.

The Town does alleges it was to be provided a reliable and economic gas supply, but also alleges that the Authority "was obligated under the Supply Contract to advise the Town at least annually of the status of purchases of gas supplies," the Authority "failed to inform the Town that it had made hedges five years advance in breach of this obligation," and the Authority "attempted to place the cost of this unilateral decision back on the Town[.]" (Docket No. 25, Amended Complaint ¶¶ 43-44). These allegations suggest multiple possible breaches, and also suggest that the Gas Authority was not doing as it was supposed to do under the Supply Contract.

The Authority argues that Count Two, which alleges a breach of contract in relation to the Hedging Authorization, is subject to dismissal because "Smyrna is likely relying upon representations it alleges were made to it in 2003 and earlier," and "these representations would accordingly be superseded by the 2005 Gas Supply Contract." (Docket No. 33 at 15). Although the Authority correctly observes that oral representations made antecedent to execution of a written contract are merged into the written contract, at this point, the Authority has yet to establish that the Supply Contract and the hedging authorization concern the same subject matter so as to come within the ambit of the merger doctrine. Further, the Court cannot say as a matter of fact that Smyrna will

"likely" rely on representations that were made to it at some point prior to execution of the 2005 Supply Contract, particularly since the contract identified in Count Two is the 2007, and not the 2003, Hedging Authorization.

The Authority also seeks dismissal of Smyrna's claim for breach of contract implied in fact because the same would be barred by the statute of frauds under the Uniform Commercial Code ("UCC), and because both Tennessee and Georgia forbid implied contracts where a comprehensive contract exists governing the subject matter. Again, the Court cannot say at this point that the 2005 Supply Contract preempts any implied contract in relation to hedging, particularly the hedging authorizations that were submitted some two years later. Moreover, and according to the Amended Complaint, when the hedging program was announced, it was touted as a new "service" for municipalities, and the statute of frauds under the UCC is only applicable to the sale of "goods," not "services." See, Tenn. Code Ann. § 47-2-102; O.C.G.A. § 11-2-102 (both indicating that the UCC "applies to transactions in goods").

The Authority further argues that Smyrna's TCPA claim as set forth in Count Four is subject to dismissal because all that is alleged is that the Gas Authority's actions constitute unfair and deceptive trade practices. However, Count Four incorporates by reference all previous paragraphs, and there are plenty of allegations to support an alleged violation of the TCPA's general prohibition against "unfair and deceptive trade practices," Tenn. Code Ann. § 47-18-104(a), and allegations which could support a claim for violations of the TCPA's provisions relating to the false representation of goods or services, and/or the advertising of goods or services without the intent to sell them as advertised. Id. §§ 104(b)(4) & (9).

The Authority additionally argues that Smyrna cannot show a breach of fiduciary duty

because, under both Georgia and Tennessee law, contractual relationships are not fiduciary relationships. While there is facial appeal to this argument, the Court will not dismiss the claim at this time.

Under Tennessee law, "fiduciary relationships may arise whenever confidence is reposed by one party in other who exercises dominion and influence." Foster Bus. Park, LLC v. Winfree, 2009 WL 113242 at *13 (Tenn. Ct. App. Jan. 15, 2009). Similarly, under Georgia law, a fiduciary relationship can arise "where one party is so situated as to exercise a controlling influence over the will, conduct and interest of another[.]" Douglas v. Bigley, 628 S.E.2d 199, 204 (Ga. App. 2006). In both states, whether one is justified in reposing confidence in another is generally a factual matter. Id.; Watkins v. HRRW, LLC, 2006 WL 3327659 at *8 (M.D. Tenn. Nov. 14, 2006). Based solely on the pleading, the Court cannot say as a matter of law that the Authority owed no fiduciary duty to the Town.

Finally, the Authority argues that Smyrna's unjust enrichment claim is due to be dismissed because the Town alleges that a valid contract existed between the parties and it cites Georgia and Tennessee cases for that proposition. See, Donchi, Inc. v. Robbol LLC, 283 Ga. App. 161, 166 (Georgia App. 2007); Crossville, Inc. v. Kipper Design Ctr., Inc., 758 F.Supp.2d 518, 532 (M.D. Tenn. 2010). It is true that *recovery* may not be had under both a breach of contract and an unjust enrichment theory, but a party is allowed to plead alternative theories of recovery. See, Fed. R. Civ. P. 8(d)(3) ("A party may state as many separate claims or defenses as it has, regardless of consistency"); Holt v. Macy's Retail Holdings, Inc., 719 F.Supp.2d 903, 916 (W.D. Tenn. 2010) ("because a quasi-contractual remedy such as unjust enrichment requires the absence of a valid contract, the Court will assume that Plaintiffs intended to plead this cause of action as an alternative

to their claim for breach of contract"); <u>Wachovia Ins. Serv. Inc. v. Fallon</u>, 682 S.E.2d 657, 665 (Ga. App. 2009) (citation omitted) ("'A claim for unjust enrichment is not a tort, but an alternative theory of recovery if a contract claim fails").[9]

Obviously, the foregoing rulings in relation to the Authority's 12(b)(6) motion may be revisited in the context of a Motion for Summary Judgment after the factual record has been developed. For now, however, the Court finds that the Town has alleged sufficient facts to make each of its legal claims plausible.

### III. CONCLUSION

On the basis of the foregoing, the Gas Authority's Motion to Transfer, Dismiss, or Abstain With Respect to Plaintiff's First Amended Complaint (Docket No. 32) will be denied, rendering its initial Motion to Transfer, Dismiss, or Abstain (Docket No. 19) moot. The Gas Authority's Motion to Dismiss Based on the Doctrine of Sovereign Immunity (Docket No. 40) will be denied.

It is SO ORDERED.

_Kevin H. Sharp_
_____
KEVIN H. SHARP
UNITED STATES DISTRICT JUDGE

---

[9] In its reply brief, the Authority also argues that Smyrna's unjust enrichment claim is "weak and subject to dismissal in the absence of an allegation that the Gas Authority (a non-profit entity) charged Smyrna anything but its actual costs." (Docket No. 39 at 9.) The critical question at this point is not whether a claim is "strong," but whether it is plausible. Moreover, Smyrna does allege that the Authority received an unjust benefit, that being the amounts paid by the Town for the allegedly unauthorized hedging.