# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| **TOWN OF SMYRNA, TENNESSEE** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 3:11-00642** |
| | ) | **Judge Sharp** |
| **THE MUNICIPAL GAS AUTHORITY OF** | ) | |
| **GEORGIA,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## <u>MEMORANDUM</u>

In this case, set for trial at the end of the month, Defendant Municipal Gas Authority of Georgia ("the Gas Authority" or "MGAG") has filed a Motion to Dismiss Plaintiff Town of Smyrna's ("Town's" or "Smyrna's") claims under the Tennessee Consumer Protection Act and False Claims Act (Docket No. 143), and a Motion for Summary Judgment (Docket No. 149) on those claims and others. Both motions have been exhaustively briefed[1] with the last sur-reply filed on July 24, 2015.

On at least four occasions, the Court has had the opportunity to review this file in the context of MGAG's Motions to Dismiss, and finds it unnecessary to set forth a detailed exposition of the parties' respective position on the facts. Instead, the Court will reference the factual contentions in the context of ruling on the specific legal issues presented.

Further, while MGAG' has chosen to file both a Motion to Dismiss under Rule 12(c) and a Motion for Summary Judgment under Rule 56(c), the two overlap to some extent, the parties have

---

[1] Given the extensive briefing, the Court finds it unnecessary to hear oral argument and will deny MGAG's's request for the same.

briefed the issues in the context of both motions, and Plaintiff relies upon facts not pled in its Complaint.  Accordingly, the Court will treat all arguments as if raised in the context of the Motion for Summary Judgment.  See,  Max Arnold & Sons, LLC v. W.L. Hailey & Co., 452 F.3d 494, 503 (6th Cir. 2006) ("Rule 12(c) requires only one action by the district court for the conversion to a summary judgment motion to occur: failure to exclude presented outside evidence").

The standards governing summary judgment motions are, of course, well known.  A party may obtain summary judgment if the evidence establishes there are no genuine issues of material fact for trial and the moving party is entitled to judgment as a matter of law.  See FED. R. CIV. P. 56(c); Covington v. Knox Cnty. Sch. Sys., 205 F.3d 912, 914 (6th Cir. 2000).   A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986).   In ruling on a motion for summary judgment, the Court must construe the evidence in the light most favorable to the nonmoving party, drawing all justifiable inferences in his or her favor.  See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). With those standards in mind, the Court turns directly MGAG's arguments.

## I. Tennessee Consumer Protection Act

"The Tennessee Consumer Protection Act, Tennessee Code Annotated Sections 47–18–101, *et seq.* ('TCPA'), prohibits, among other things, 'unfair or deceptive acts or practices affecting the conduct of any trade or commerce'  Tenn. Code Ann. § 47–18–104(a),'" and characterizes "[a] 'deceptive' act or practice [a]s 'one that causes or tends to cause a consumer to believe what is false or that misleads or tends to mislead a consumer as a matter of fact.'"   Borla Performance Indus., Inc. v. Universal Tool & Eng., Inc., 2015 WL 3381293, at *13-14 (Tenn. Ct. App. May 26, 2015) (quoting Tucker v. Sierra Builders, 180 S.W.3d 109, 116 (Tenn. Ct. App. 2005)).  Actions under the TCPA "shall be brought within one (1) year from a person's discovery of the unlawful act or

practice," with a five-year statute of repose. Tenn. Code Ann. § 47-18-110.

MGAG argues that Smyrna's TCPA claim is untimely. It asserts that, as alleged in the Second Amended Complaint, Smyrna knew "shortly after February 23, 2010" that MGAG was placing allegedly unauthorized longer-term hedges on the Town's behalf. (Docket No. 144 at 4). At the very latest, MGAG argues, "Smyrna knew by April 2, 2010, that MGAG had placed the disputed hedges and that the Town was obligated to pay for them because the Gas Authority sent Smyrna a written response that day saying as much." (Id.).

In response, Smyrna first argues that the one-year statute of limitations is inapplicable under the *nullum tempus* doctrine. The Court is unpersuaded by that argument.

"'The ancient rule *quod nullum tempus occurit regi* – that the sovereign is exempt from the consequences of its laches . . . has enjoyed continuing vitality for centuries.'" United States v. Mandycz, 447 F.3d 951, 964 (6th Cir. 2006) (quoting United States v. Peoples Household Furnishings, Inc., 75 F.3d 252, 254 (6th Cir. 1996)). "[L]iterally translated as 'time does not run against the king,'" the doctrine is recognized in Tennessee and "prevents an action brought by the State from being dismissed due to the expiration of the statutory period of limitations normally applicable to the specific type of action," with the rationale being "'that the public should not suffer because of the negligence of its officers and agents[.]'" City of Elizabethton v. N. Am. Fibers, Inc., 2004 WL 2636710, at *3 (Tenn. Ct. App. Nov. 19, 2004) (quoting State *ex rel*. Bd. of Univ. & Sch. Lands v. Andrus, 671 F.2d 271, 274 (8th Cir. 1982)). "'This doctrine is not to be lightly regarded [because] statutes of limitation are looked upon with disfavor in actions brought by the State, and will not be enforced in the absence of clear and explicit statutory authority to do so.'" Hamilton Cnty. Bd. of Educ. v. Asbestospray Corp., 909 S.W.2d 783, 785 (Tenn. 1995) (quoting Dunn v. W.F.

Jameson & Sons, Inc., 569 S.W.2d 799, 802 (Tenn. 1978)).

In "certain case," the *nullum tempus* doctrine applies "to subordinate organs of the state, such as counties or municipalities." Id. Specifically,

> The statute of limitations does not run against the sovereign or the state, or against a county, when [the county is seeking] to enforce a demand arising out of, or dependent upon, the exercise of its governmental functions as an arm of the state. But the statute does run against a county or municipality in respect of its rights or claims which are of a private or corporate nature and in which only its local citizens are interested, as distinguished from a public or governmental matter in which all the people of the state are interested.

Id. (quoting Wood v. Cannon Cnty., 166 S.W.2d 399, 401 (Tenn. Ct. App. 1942).

In support of its position on the *nullum tempus* doctrine, the Town relies upon a number of cases, none of which involved the supply of natural gas to the local citizenry. Several of the cases have to do with suits involving schools and, in this vein, it is important to recognize "that the State of Tennessee has accepted, both in its constitution and statutory code, the duty of providing a free public education to its citizens" and, "[b]ecause of education's inclusion in both the fundamental law and legislation of this state, its provision is a quintessential governmental, not a private, function." Hamilton Cnty., 909 S.W.2d at 786 (collecting cases).

The case which appears to have the farthest reach, one of the two on which the Town of Smyrna primarily relies, is City of Elizabethton. There, the city recovered damages against a landowner for breach of a sewer easement that was part of the path for the city's underground sewer line and on which the landowner dumped cinders and fly ash.

On appeal, the court recognized that, even though the damages that were awarded benefited the city's residents because the cost of a new sewer system would be paid for by defendant landowner, "the problem which resulted in the award of damages – the problem which prompted the

prosecution of th[e] case – was the fact that a significant portion of the City's sewage system was rendered inaccessible as a result of the overburden placed upon it by [defendant]." 2004 WL 2636710, at *4. This was hardly a small matter, as the city's wastewater manager testified that, had there been blockage or collapse of the sewer line, the potential existed for "an environmental catastrophe with millions of gallons of wastewater going into the Watauga River and spilling into the fields upstream[.]" Id.

Inasmuch as the Tennessee Water Control Act states "that the waters of Tennessee are the property of the state and are held in public trust for the use of the people of the state" and "declare[s it] to be the public policy of Tennessee that the people of Tennessee as beneficiaries of this trust, have a right to unpolluted waters," which "the government of Tennessee has an obligation . . . to secure, protect, and preserve," Tenn. Code Ann § 69-3-102(a), the court found that the suit "benefit[ed] not only the citizens of Elizabethton, but the general population of this state by securing, protecting and preserving the 'right to unpolluted waters.'" Id. at 4. As a consequence, "[t]he City was engaged in the exercise of a governmental function as an arm of the state" in bringing suit, and the *nullum tempus* doctrine applied. Id.

The other case, Knox Cnty. *ex rel.* Shumpert v. Perdeptics Corp., 1998 WL 668721 (Tenn. Ct. App. September 30, 1998) involved the alleged breach of a contract with the Register of Knox County relating to the provision of computer hardware and software. Noting that a Register of Deeds is a constitutional office and that his or her duties require the keeping of records to be "exhibit[ed] . . . to all persons wishing to inspect them," the court held that "[t]he point need not be labored that the Register's office is a vital function of government affecting all citizens of the state." Id. at *3 & 4.

This is not a case about taking action to prevent an environmental catastrophe, nor is it a case about insuring that a vital constitutional office continues to run unimpeded. Instead, and as the Sixth Circuit has pointed out, "[t]he underlying dispute in this case is essentially a disagreement over the price of gas," Town of Smyrna v. Mun. Gas. Auth. of Ga., 723 F.3d 640, 644 (6ᵗʰ Cir. 2013), and any recover will inure solely to the benefit of the Town and perhaps its citizens.

The *nullum tempus* doctrine aside, "a cause of action accrues and the statute of limitations begins to run not only when the plaintiff has actual knowledge of a claim, but also when the plaintiff has actual knowledge of 'facts sufficient to put a reasonable person on notice that he [or she] has suffered an injury as a result of wrongful conduct.'" Redwing v. Catholic Bishop for Diocese of Memphis, 363 S.W.3d 436, 459 (Tenn. 2012) (quoting, Carvell v. Bottoms, 900 S.W.2d 23, 29 (Tenn. 1995)). In support of its position that the Town knew or reasonably should have known about the allegedly unauthorized hedges by the spring of 2010, MGAG points to the following from the record:

• Smyrna alleges that shortly after February 23, 2010, the Gas Authority informed the Town (1) that the Gas Authority "had executed 100% of the hedges for the program participants," (2) that "the Town would not be permitted to reduce its volumes," and (3) that the Town was "obligated to accept [the] prices" imposed by the now-challenged hedges.

• In a March 3, 2010 email, Smyrna said that it "was dismayed by the revelation that the Authority had already implemented hedges for next winter" and reiterated that it "d[id] not recognize [those] hedges . . . ."

• Mark O'Neal, Smyrna's 30(b)(6) representative agreed that on "March 3, 2010, it was the Town's position that the Gas Authority had engaged in unauthorized hedges."

• On April 1, 2010, Smyrna sent a second email complaining that the "Gas Authority had made unauthorized commitments to hedges for the next three winters" and expressing frustration that the Gas Authority "expected the Town . . . to accept hedge prices and volumes that the Town had not requested."

• On April 7, 2010, the Gas Authority sent a letter responding paragraph by paragraph to Smyrna's April 1, 2010 email. In that letter, the Gas Authority affirmed its position that Smyrna was bound by "any hedges the Gas Authority has already put in place."

(Docket No. 192 at 2-4).

Notwithstanding that "whether a statute of limitations has run" is "'frequently a question of fact to be determined by the jury or trier of fact under the evidence,'" it can sometimes be "a question of law to be determined by the Court.'" <u>Taylor v. Metro. Gov't of Nashville & Davidson Cnty.</u>, 2008 WL 5330502, at *5 (Tenn. Ct. App. Dec. 19, 2008) (quoting <u>Osborne Enter., Inc. v. City of Chattanooga</u>, 561 S.W.2d 160, 165 (Tenn. Ct. App. 1977). Given the evidence presented by the Gas Authority, the Town knew or should have known in the Spring of 2010 that MGAG was allegedly placing unauthorized multi-year hedges, particularly since "[t]he discovery rule is not intended to permit a plaintiff to delay filing suit until the discovery of all the facts that affect the merits of his or her claim." <u>Redwing</u>, 363 F.3d at 459.

The Town argues that under the TCPA an injury must be in the form of "an ascertainable loss" and that, even though it "discovered that there was something amiss in the spring of 2010, it did not know whether MGAG would impose charges for the unauthorized hedges after the Town voiced its objections." (Docket No. 156 at 21). Rather, it claims the "the Town did not know it suffered an ascertainable loss until it received an invoice for the unauthorized winter 2010-2011 hedges in December 2010.

Taken to its logical extreme, Smyrna's argument would apply in virtually every case. As MGAG points out, "[b]efore final judgment a defendant can always decide to abandon its litigation position or to settle claims (for any or no reason)," but "[t]hat does not mean that the limitations period isn't running." (Docket No. 192 at 5). The Town does not direct the Court's attention to

evidence which indicates that the Gas Authority suggested that it would excuse Smyrna from being bound by, or from paying for, the hedges that had already been placed.[2] Rather, the evidence suggests that the December 2010 invoices were nothing but the inevitable consequence of the placing of the multi-year hedges.

In any event the date of the ascertainable loss does not begin the running of the statute of limitations under the TCPA. Rather, under the language of the statute, "[a]ny action . . . Shall be brought within one(1) year from a person's discovery fo the unlawful act or practice." Tenn. Code Ann § 47-18-110. The evidence before the Court shows that the Town indisputably knew about the placing of allegedly unauthorized hedges in the spring of 2010, and that is what it claims to be the unlawful act or practice. See Overton v. Westgate Resorts, Ltd., 2015 WL 399218, at *11 (Tenn. Ct. App. Jan. 30, 2015) ("A claim under the Tennessee Consumer Protection Act accrues when a plaintiff discovers the unlawful act or practice").

The Town also argues that MGAG should be equitably estopped from asserting the statute of limitations defense. The Court disagrees.

The doctrine of equitable estoppel "tolls the running of the statute of limitations where the defendant has 'misled the plaintiff into failing to file [his] action within the statutory period of limitations.'" Farhner v. SW Mfg., Inc., 48 S.C.3d 141, 145 (Tenn. 2001). "[W]henever a defendant has made out a prima facie statute of limitations defense, the plaintiff must demonstrate that the defendant induced him or her to put off filing suit by identifying specific promises, inducements,

---

[2] The Town argues that "the April 6, 2010 letter from the Gas Authority did not specifically address the Town's request to honor its election for the 2010-2011 winter season or its request to opt out of the hedging program altogether if MGAG did not honor the Town's specified elections," and that the Gas Authority did not reply to an July 12, 2010 "email with reduced volumes the Town wished to hedge for the upcoming winter season[.]" (Docket No. 156 at 22). This actually lends support to the Gas Authority's position because silence oftentimes speaks volumes.

suggestions, representations, assurances, or other similar conduct by the defendant that the defendant knew, or reasonably should have known, would induce the plaintiff to delay filing suit." Redwing, 363 S.W.3d at 460.

"A clear example" of equitable estoppel, and "the one most prominent in the case law, is a defendant's promise not to plead the statute of limitations, which he breaks once the plaintiff has waited for the statute to expire before filing his complaint." Fahrner, 48 S.W.3d at 145. Other "[e]xamples of circumstance which have prompted the courts to invoke the doctrine" include "when a defendant promises to pay or otherwise satisfy the plaintiff's claim without requiring the plaintiff to file suit" and when "a defendant promises to settle a claim without litigation following the conclusion of another proceeding between the defendant and a third party." Redwing, 363 S.W.3d at 460-61.

"The party invoking the doctrine of equitable estoppel has the burden of proof," id., and the Town has not met that burden. It identifies nothing which shows that MGAG made any statements that it knew or reasonably should have known would induce the Town to forgo or delay suit.[3]

## II. <u>Tennessee False Claims Act</u>

The Tennessee False Claims Act ("TFCA") became effective on July 1, 2001, and "establishes penalties for filing false claims with state, county, or municipal governments." State <u>ex rel</u>. Landenberger v. Project Return, Inc., 2009 WL 637122, at *3 (Tenn. Ct. App. 2009). It

---

[3] In a footnote to its response to Defendant's Motion to Dismiss, the Town request that it be allowed to amend its complaint should the Court decide to dismiss the TCPA claim. That request is summarily denied. Not only is the trial just weeks away, discovery closed long before the Town filed its response and, in any event, "[a] 'request for leave to amend almost as an aside, to the district court in a memorandum in opposition to the defendant's motion to dismiss is . . . not a motion to amend.'" Kuyat v. BoMimetic Therapeutics, Inc., 746 F.3d 435, 444 (6th Cir 2015) (quoting La. Sch. Emps.' Ret. Sys. v. Ernst & Young, LLP, 622 F.3d 471, 486 (6th Cir.2010)).

contains a laundry list of prohibitions directed at "any person" who files claims, with "person" broadly defined as "any natural person, corporation, firm, association, organization, partnership, limited liability company, business, or trust[.]" Tenn. Code Ann. §§ 4-18-102(3) & 103.

MGAG was created by the Georgia General Assembly in 1987 as a "public body corporate and politic"—a nonprofit "instrumentality" and "public corporation of the State of Georgia," charged by statute with securing "adequate, dependable, and economical sources and supplies of gas" for its Members.  O.C.G.A. §§ 46-4-82(a), 80 & 95.  Given its designation as a public corporation, the Gas Authority first asserts that it is not a "person" subject to the prohibitions contained in the TFCA.

In support of its argument, the Gas Authority relies on Keeble v. Loudon Utilities., 370 S.W.2d 531, 536 (Tenn. 1963) ,as "illustrat[ing] the rule" that "when a statute refers to corporations, it means only *private* corporation, not *public* corporations."  (Docket No. 144 at 5, emphasis in original).  But that case was decided decades before the enactment of the TFCA and, in any event, is inapposite.

Keeble involved the application of a general venue statue, with the question being whether Loudon Utilities, a municipal corporation, could be sued in a particular county pursuant to a provision which related to "corporations, either domestic or foreign, which maintained an office or agency, or are otherwise amenable to service of process, in a county in this state other than the county in which the cause of action arose."  Keeble, 370 S.W.2d at 491.  Noting that "[a]ctions against municipalities are local actions which must be brought in the county in which the municipality is located," a "rule . . . recognized and applied many times in this state," and "that neither by the letter of the statute nor by legislative intent" did the statue "apply to municipal

corporations," id. at 493-94, the Tennessee Supreme Court held that a public utility owned by the City of Loudon could not be sued in adjacent Monroe County.

The statute at issue here is markedly different than the one in Keeble.  It is also markedly different  than the other statutes that "expressly reach 'public corporations" which MGAG cites, such as the Uniform Principal and Income Act, Tenn Code Ann. 35-6-102(9), the Energy Production Facilities Act, Tenn. Code Ann. § 7-54-105(5), and the Atomic Energy and Nuclear Materials Act, Tenn. Code Ann. 68-202-301(3).  (Docket No. 144 at 6).

No doubt, a court "must presume that the legislature knows of the existing state of the law when it enacts new legislation."  Blankenship v. Estate of Bain, 5 S.W.3d 647, 651 (Tenn. 1999). However, "[a] 'basic rule of statutory construction is to ascertain and give effect to the intention and purpose of the legislature.'" Gleaves v. Checker Cab Transit Corp., Inc., 15 S.W.3d 799, 802 (Tenn. 2000) (quoting, Carson Creek Vacation Resorts, Inc. v. State Dep't. of Revenue, 865 S.W.2d 1, 2 (Tenn. 1993)).

The Tennessee legislature specifically declared the TFCA "to be remedial in nature" and that it was to "be liberally construed to effectuate its purpose."  Tenn. Code Ann. § 4-19-107.  The bill's sponsor in the House of Representatives "explained that the purpose of the act '[wa]s to prevent fraud on the government," and, indeed, "like its federal counterpart, target[s] a much broader array of fraudulent activity perpetrated against state and local governments."  Knox Cnty. ex. rel. Envtl Termite & Pest Control, Inc. v. Arrow Exterminators, Inc., 350 S.W.3d 511, 523 & 556 (Tenn. 2011).  Given this, the Court tends to agree with the Town's assertion that were MGAG's argument to be adopted, "it would lead to an absurd result that the legislature clearly never intended: entities doing business with the cities and State of Tennessee are free to submit false or fraudulent claims

for payment simply because the entity was created by another state's legislature." (Docket No. 156, 26).

Moreover, while the statutory language is always the starting point, "[w]hen state courts are called upon to interpret state constitutional provisions, statutes, rules, or regulations that have federal counterparts, it is not uncommon for them to consider and adopt the federal courts' interpretation of similar federal provisions." <u>Id</u>. at 524 n.33; <u>see</u> <u>also</u>, <u>State</u> <u>ex rel.</u> <u>Landenberger</u>, 2009 WL 637122, at *4 ("There are as yet no appellate decisions interpreting the TFCA" and "[w]e therefore look to decisions interpreting the federal False Claims Act . . .") The Federal Claims Act, too, prohibits certain actions by "persons," but does not define the term. Nevertheless, the Supreme Court has held it applicable to counties for a number of reasons, including that "local governments are commonly at the receiving end of all sorts of federal funding schemes and thus no less able than individuals or private corporations to impose on the federal fisc and exploit the exercise of the federal spending power." <u>Cook Cnty. Ill. v. U.S. e rel. Chandler</u>, 538 U.S. 119, 129 (2003). The same can be said about a public corporation and municipal funds, particularly "one that operates as an independent non-profit corporation." <u>Town of Smyrna</u>, 723 F.3d at 650.

Turning to the merits, the Gas Authority levels a multi-prong attack on the Town's TFCA claim, arguing that "[a]t most . . . the case is about an ambiguous contractual relationship," and that the very essence of the Town's claim relates to the placing of unauthorized hedging and billing for the same. The argument continues that because the Gas Authority's actions were in keeping with the contract between the parties, there could be no TFCA violation.

The Court finds this to be a close question because, in many respects, the Town's TFCA claim appears to be a dressed-up version of its breach of contract claim. Indeed, were this case

simply a dispute about what was authorized, the Court would have little hesitation in accepting the Gas Authority's position. After all, a mere breach of contract generally does not a false claim make. See, United States v. Sanford-Brown, Ltd., 788 F.3d 696, 710 (7th Cir. 2015) ("a mere breach of contract does not give rise to liability under the False Claims Act."); United States *ex rel.* Steury v. Cardinal Health, Inc., 625 F.3d 262, 268 (5th Cir. 2010) ("Not every breach of a federal contract is an FCA problem"); United States *ex rel*. Owens v. First Kuwaiti Gen. Trading & Contracting Co., 612 F.3d 724, 728 (4th Cir. 2010) (citation omitted) (the FCA "does not allow a *qui tam* relator to 'shoehorn what is, in essence, a breach of contract action into a claim that is cognizable under the False Claims Act'"). However, "[i]f the breaching party falsely claims to be in compliance with the contract to obtain payment, . . . there may an actionable false claim," United States *ex rel.* Yannacopoulos v. Gen. Dynamics, 652 F.3d 818, 824 (7th Cir. 2011), and liability may attach where a claimant makes "a request for payment under a contract but 'withh[olds] information about its noncompliance with material contractual requirements.'" United States v. Triple Canopy, Inc., 775 F.3d 628, 636 (4th Cir. 2015) (citation omitted). In such cases, "[t]he 'pertinent inquiry' is 'whether, through the act of submitting a claim, a payee knowingly and falsely implied that it was entitled to payment.'" Id. (quoting United States *ex rel.* Lemmon v. Envirocare of Utah, Inc., 614 F.3d 1163, 1169 (10th Cir.2010)).

Moreover, the TFCA may be broader than its federal counterpart. It contains a specific provision that imposes liability on any person who "[k]nowingly makes, uses, or causes to be made or used any false or fraudulent conduct, representation, or practice in order to procure anything of value directly or indirectly from the state or any political subdivision." Tenn. Code Ann. 4-18-103(a)(9). The Town points to facts which, if true, might lead a reasonable jury to conclude that the

Gas Authority violated the TFCA. This includes, but is not limited to, misrepresenting the hedges that had been placed and failing to disclose their volume at an earlier time so that they could be challenged by the town, providing misleading invoices, deceiving the Town into extending its relationship with the Gas Authority, and failing to share documents that would have indicated that MGAG had placed hedges beyond the upcoming winter season.

That said, it very well may be that the Gas Authority did not knowingly do anything wrong. It claims it had no motive to defraud because it holds property for the benefit of the public, its assets belong to its members pursuant to O.C.G.A. § 4-4-96(a)(3), and, as such "anything of value that the Gas Authority would 'procure' from Smyrna *already belongs to Smyrna* and the other members." (Docket No. 150 at 16, italics in original). That may be so, but motive is not an essential element of a false claims case, see, United States v. Pecore, 664 F.3d 1125, 1133 n.5 (7th Cir. 2011); U.S. *ex rel*. Harrison v. Westinghouse Savannah River Co., 352 F.3d 908, 921 (4th Cir. 2011), although the jury may consider the lack thereof in determining whether the Gas Authority acted with a fraudulent intent. *Cf*., Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 325 (2007) (the absence of motive in a securities act case, "personal financial gain may weigh heavily in favor of a scienter inference").

It may also be that the Gas authority did exactly what the parties intended and, as a consequence, it made no false claims for payment. And, relatedly, it may also be true that it never presented the Town with anything that it knew to be false. But these will ultimately be questions for the jury to decide assuming, that is, that the Town's proof establishes to the Court's satisfaction that its TFCA claim is something more than a breach of contract claim in masquerade.

### III. **Breach of Fiduciary Duty**

The Gas Authority is the largest natural gas joint action in the United States, serving 78 Member municipalities from Georgia, Alabama, Florida, Pennsylvania and Tennessee that, in turn, serve more than 240,000 customers. Although the Gas Authority retains a portion of the revenues, Members share in its revenues and are responsible for costs.

In 2000, Smyrna became a Gas Authority customer. It became a Non-Georgia Member of the Gas Authority when, on March 14, 2006, the Town Council approved an October 1, 2005 full requirement Gas Supply Contract with MGAG.

In the Fifth Count of the Second Amended Complaint, Smyrna brings a claim for breach of fiduciary duty. Specifically, Smyrna alleges that MGAG "owed a duty of care to the Town pursuant to the fiduciary relationship that existed between the parties," and that "MGAG breached its fiduciary duty to the Town by committing the Town to hedges that it had not authorized for at least a five year time period." (Docket No. 94, Second Amended Complaint ¶¶ 61-62).

MGAG argues that, for any of a number of reasons, this claim fails , and argues that it owed no fiduciary duty to its Members, including the Town. With some hesitation, the Court will allow the claim to go forward at this time.

"A fiduciary is a person holding the character of a trustee who bears the duty to act primarily for the benefit of another." Sanford v. Waugh & Co., Inc., 328 S.W.3d 836, 843 (Tenn. 2010) (citing McRedmond v. Estate of Marianelli, 46 S.W.3d 730, 738 (Tenn. Ct. App. 2000). MGAG begins by arguing that, as a matter of law, a corporation owes no fiduciary duty to its shareholders or members. Instead, the fiduciary duty is owed by the corporation's directors and officers.

MGAG's position is undoubtedly correct because, as a general proposition, "a corporation is governed by its directors and officers," and it is they who "owe a fiduciary duty to the corporation

and to its shareholders," that is, "[a]s fiduciaries, corporate officers and directors must act in good faith" towards the members or shareholders. <u>Id</u>. Indeed, the Sixth Circuit has characterized the contrary argument as being based on "a fundamental misunderstanding of the nature of the corporate director's fiduciary relationship." <u>Radol v. Thomas</u>, 772 F.2d 244, 258 (6th Cir. 1985). This is because "[a] corporation is a legal entity created in derogation of the common law," whose "authority . . . is to be exercised under the direction of the corporation's directors, who must act in a manner they reasonably believe to be in the corporation's best interests." <u>Id</u>. In this sense, "[t]he directors stand, roughly, as trustees over the corporation, administering it for the benefit of the beneficial owners, the shareholders." <u>Id</u>.

Given this framework, courts routinely hold that a corporation owes no fiduciary duty to its shareholders or members. <u>See</u>, <u>Bateman v. JAB Wireless</u>, 2015 WL 4077923, 4 (D. Utah July 6, 2015) (plaintiffs "have directed the court to no Utah or Colorado authority recognizing a fiduciary relationship between a corporation and its shareholders," and other courts, including the Sixth Circuit in <u>Rodol</u> "have considered and rejected the position urged by plaintiffs"); <u>In re Swisher Hygiene, Inc.</u> 2015 WL 4132157, 13 at n.4 (W.D.N.C. July 8, 2015) (the claim against Swisher itself should be dismissed because a corporation does not owe fiduciary duties to its shareholders"); <u>In re PHC, Inc. Shareholder Litig.</u> 2012 WL 1195995, at *4 (D. Mass. Mar. 30, 2012) ("as a corporation, PHC itself owes no duty to its shareholders under Massachusetts law"); <u>Onex Food Serv., Inc. v. Grieser</u>, 1996 WL 103975, at *7 (S.D.N.Y. 1996) ("a corporation does not owe a fiduciary duty to its shareholders nor may it be held vicariously liable for breaches of fiduciary duty committed by its officers"); <u>Johnston v. Wilbourn</u>, 760 F. Supp. 578, 590 (S.D. Miss. 1991) (same); <u>Burcham v. Unison Bancorp, Inc.</u>, 77 P.3d 130, 147 (Kan. 2003) ("The plaintiffs have not cited any

Kansas case in which the court found that a corporation owes a fiduciary duty to its stockholders; rather, it is the corporate management that owes the duty to both the corporation and its stockholders") see also, Schupp v. Jump! Info. Techs., 65 Fed. App'x 450, 454 (4th Cir. 2003) (citing Rodol and "not[ing] doubts that a shareholder can maintain an action for breach of fiduciary duty directly against the corporation itself"). As the Sixth Circuit in Rodol explained:

> Liability for breach of the directors' fiduciary obligation could not possibly run against the corporation itself, for this would create the absurdity of satisfying the shareholders' claims against the directors from the corporation, which is owned by the shareholders. There is not, and could not conceptually be any authority that a corporation as an entity has a fiduciary duty to its shareholders.

Radol v. Thomas, 772 F.2d at 258.

This does not end the inquiry, however, because the Town argues that, even apart from whatever duties a corporation may or may not have to its shareholders/members, the connection between the Town and MGAG in relation to hedging presented "a textbook example of a principal-agent relationship." (Docket No. 172 at 20). After all, "the Town granted authority to, and placed its trust and confidence in, MGAG to hedge natural gas prices on the Town's behalf." (Id.). More fully, Smyrna's argument is as follows:

> The parties' course of dealing, the agreements and documents exchanged by the parties, and the Georgia statute that created MGAG demonstrate MGAG was the Town's agent.

> Each year, the Town authorized MGAG to hedge certain volumes of the Town's annual gas supply needs for the upcoming winter season. MGAG executed the hedges on the Town's behalf, not its own. . . . Regardless of what dispute the parties have about how long MGAG could hedge out the Town's volumes, there is no question that under the Option 2 hedging program the Town relinquished its right to make certain hedging decisions for itself, giving MGAG the authority determine how much of the Town's authorized volumes it would hedge, the date it would execute the hedge, and the particular instrument used to hedge. . . .

> At the same time, MGAG remained subject to the Town's control. MGAG could

only hedge the volumes the Town authorized, and the Town could remove MGAG's authority to hedge by opting out of the program and self-directing its hedges (although MGAG ultimately and wrongfully denied the Town this right after the Town tried to opt out in April and July 2010 and MGAG invoiced the Town for the unauthorized hedges in December 2010 and forward). . . . And, MGAG was to provide the Town a monthly report of the hedges it placed on its behalf. . . .

Even the Georgia statute that created MGAG states it is an agent of the municipalities it contracts with. Ga. Code Ann. § 46-4-96(a) reads:

> "The authority shall have the powers necessary or convenient to carry out and effectuate the purpose and provisions of this article, including . . . the power[] . . . (5) To acquire … and to place into operation and operate . . . either as owner of all or any part in common with others *or as agent*, facilities and projects for the . . . acquisition . . . sale, exchange, or interchange of gas; to acquire and to provide by sale or otherwise, an adequate, dependable, and economical gas supply to political subdivisions of this state . . . and, *as agent for such political subdivisions*, to secure gas contracts and arrangements with other persons. The authority shall also have the power, which may be exercised either as principal or *as agent*, . . . to execute long-term or short-term gas purchase or sale contracts . . . ; and to continue to sell gas . . . to other persons and entities inside or outside this state and, as agent, for any or all of the same, to make gas otherwise available to them through arrangements with other persons . . ."

((Docket No. 172 at 22-24, internal citations and footnote omitted, emphasis in original).

"Agency is a fiduciary relationship that arises when one person (a 'principal') manifests assent to another person (an 'agent') that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests or otherwise consents to do so." Savage v. City of Memphis, 2015 WL 534663 (Tenn. Ct. App. Feb. 9, 2015) (citing Morrison v. Allen, 338 S.W.3d 417, 450 (Tenn. 2011) (Koch, J., concurring in part and dissenting in part)). "A common-law agency arises when the principal assents for the agent to act on the principal's behalf, and the agent agrees." Barbee v. Kindred Healthcare Operating, Inc., 2008 WL 46185858, at *6 (Tenn. Ct. App. Oct. 20, 2008).

"In its broadest sense, the concept of agency 'includes every relation in which one person acts for or represents another.'" White v. Revco Disc. Drug Ctrs., Inc., 33 S.W.3d 713, 723 (Tenn. 2000) (quoting Kerney v. Aetna Cas. & Sur. Co., 648 S.W.2d 247, 253 (Tenn. Ct. App.1982)). "The fiduciary is obligated to deal with the property of his principal in 'the utmost good faith'" and "'the duties of loyalty and honesty are also a part of a fiduciary's obligation." Ralston v. Hobbs, 306 S.W.3d 212, 221 (Tenn. Ct. App. 2009) (quoting Martin v. Moore, 109 S.W.3d 305, 309 (Tenn. Ct. App. 2003)).

MGAG argues that it owed no fiduciary duty to Smyrna with respect to hedging. To place the argument in context, a brief review of the Gas Authority's characterization of the three hedging options is appropriate.

Each Gas Authority Member had three option regarding hedging. Under Option 1, the Member agreed that MGAG would bill all gas volumes using non-hedged first-of-month prices. Under Option 3, the Gas Authority had no substantive discretion over hedging decisions because the Member participating in this option makes its own decisions about the type of hedging instrument, hedge timing, and volume.

Under Option 2, and the one central to this case, a Member elects hedge volumes and authorizes the Gas Authority to pool those volumes with other Members' elected volumes and to hedge that aggregate volume at the Gas Authority's discretion. The Gas Authority then places hedges for the entire Pool and chooses the cumulative hedge volume, the duration, the price, and the type of hedging instrument.

MGAG characterizations of Option 2 hedging lends support to its assertion that it did not have a fiduciary duty to Smyrna. This is because, during the relevant period, 68 of the 78 Members

of the Gas Authority participated in the Option 2 pool and (presumably at least) MGAG exercised its authority in relation to the options for the collective benefit of all of its Members. Further support for the Gas Authority's position is that the statute under which it was created states that it must "operate for the promotion of public general welfare" and "in an effort to better the general condition of society." O.C.G.A. § 46-98(b)(1). Further, and as MGAG states, this Court has previously observed that "there is facial appeal to th[e] argument" that "contractual relationships are not fiduciary relationships." (Docket No. 56 at 22).

Nevertheless, and for several reasons, the Court will not dismiss the fiduciary breach claim, but instead will await the presentation of Smyrna's proof to determine whether this claim properly should be considered by the jury. The Court does so for several reasons.

First, while MGAG (with some support from the record) contends that it was exercising Option 2 in the best interest of all of the hedging pool Members, "[i]t is . . . well settled that an agent may serve two masters simultaneously, so long as the objectives of one master are not contrary to the objectives of the other." White, 33 S.W.3d at 724. Arguably, when the Town turned over its right to hedge natural gas volumes to MGAG and MGAG undertook that responsibility, it did so for the Town's benefit, thereby creating a principal-agent relationship.

Second, while MGAG argues that the "Gas Authority operates for the benefit of the public, not for any particular Member's individual best interest," and relies upon the statutory language that ostensibly created the Gas Authority for that purpose, the Sixth Circuit has previously observed, that "[a]lthough it is described as an entity that supplies gas for the 'public,' O.C.G.A. §§ 46–4–80, 46–4–98(a), the Gas Authority is structured such that it benefits only municipalities that choose to become members." Town v. Smyrna, 723 F.3d at 649. Moreover, the statute governing MGAG

20

specifically contemplates that it may act "as agent for such political subdivisions," and may exercise power "either as a principal or agent[.]" O.G.C.A. § 46-4-96(a).

Third, while the Court remains skeptical about the validity of pursuing a breach of fiduciary duty claim where recovery is also sought under a written contract because "[it] is well settled law that a tort cannot be predicated on a breach of a contract," it is also true that a tort can exist "if a party breaches a duty which he owes to another independently of the contract." Clipari v. Powertel Inc., 231 F. Supp.2d 734, 736 (W.D. Tenn. 2002). In fact, the Court rejected MGAG's earlier request for dismissal because it could "not say as a matter of law that the Authority owed no fiduciary duty to the Town." (Docket No. 56 at 22). That remains the case, even in light of the summary judgment record that has been presented.

Fourth, while MGAG points to the economic loss doctrine as a corollary to the rule that a party cannot recover tort damages for what is in essence contract damages, "Tennessee's highest court has never addressed whether the economic loss doctrine applies outside the products liability context." Ham v. Swift Transp. Co., Inc., 694 F. Supp.2d 915, 922 (W.D. Tenn. 2010). "In addressing the contours of the doctrine outside of that context, many federal courts have concluded that the doctrine should not be extended beyond cases involving the sale of goods." Lick Branch Unit, LLC v. Reed, 2014 WL 546696, at *16 (E.D. Tenn. 2014).

Fifth and lastly, but maybe most importantly, "whether or not a fiduciary or confidential relationship existed is a question of fact." Dickson v. Long, 2009 WL 961784, at *8 (Tenn. Ct. App. Apr.8, 2009) (collecting cases). Because "the existence of an agency relationship 'is a question of fact under the circumstances of a particular case' based upon an examination of the agreements among the parties or of the parties' conduct," Bostic v. Dalton, 158 S.W.3d 347, 351

(Tenn. 2005) (citation omitted), the Court finds it best to consider that issue and others in the context of the proof that is presented at trial.

### IV.  Breach of Contract and Damage

In its oversized brief supporting its Motion for Summary Judgment, the Gas Authority spends little more than a page arguing that the Town's breach of contract claim should be dismissed. It also gives short shrift to its remaining argument that the claim for damages should be dismissed. In the Court's view, MGAG does so with good reason – the record does not establish that MGAG is entitled to summary judgment on either claim.

With regard to the breach of contract claim, MGAG argues that "Smyrna knew for years that the Gas Authority was placing multi-year hedges and paid for those hedges without complaint," and only saw fit to complaint when "gas prices bottomed out in the wake of the shale revolution." (Docket No. 150 at 22).  However, Smyrna points to evidence that suggests the placing of multi-year hedges contradicted MGAG's documents and representations about the nature of the hedging program, the course of dealing between the parties and that, in any event, the Town learned of the allegedly unauthorized hedging in 2010 and thereafter paid invoices under protest.  Although the Gas Authority argues that Smyrna "does not confront the many pieces of evidence showing that the Town knew all along that the Gas Authority was placing multi-year hedges on its behalf," (Docket No. 192 at 19), this is an argument about the weight of the evidence.

As for damages, MGAG argues that the Town's damages model is based on pure speculation and seeks to place Smyrna in a better position that it would have been absent the challenged hedges. This is so, MGAG submits, because "Smyrna would have continued to hedge a portion of its natural gas volumes even had it opted out of the Option 2 pool in April 2010" yet "Smyrna's damages

model assumes that Smyrna wouldn't have paid a penny to hedge from 2010 through 2014." (Docket No. 21). This is not a basis for granting summary judgment because it again goes to the weight of the evidence and to whether or not the Town was in fact damaged to the extent claimed.

"The extent of injury is not a proper inquiry at the summary judgment stage" because "[t]he law prohibits damages as too speculative only when the existence of damage is uncertain, not when merely the amount of damage is uncertain." Church v. Peralez, 39 S.W.3d 149, 172 (Tenn. Ct. App. 2000). Further, criticizing the "expert and his damages calculation" is "an insufficient basis for granting summary judgment" because "[t]he proper remedy is for Defendant to present its concerns at trial by the use of cross-examination and its own expert testimony." Salmon v. Old Nat'l Bank, 2012 WL 4213643, at *6 (W.D. Ky. Sept. 19, 2010); see also, Wendy's of Bowling Green, Inc. v. Marsh USA, Inc., 2012 WL 370486, at * 3 (M.D. Tenn. Feb, 3, 2012) ("If a jury finds that Defendant breached its contract with Plaintiff, causing Plaintiff damages, then the extent to which Plaintiff reasonably attempted to mitigate its damages, and also what money it would take to place Plaintiff in the same position it would have been in if the contract had not been breached are questions for the trier of fact, precluding summary judgment on this issue").

## V. Conclusion

On the basis of the foregoing, the Court will enter an Order denying the Gas Authority's Motion to Dismiss as moot and denying its Motion for Summary Judgment on Smyrna's TFCA, breach of fiduciary duty, breach of contract and damages claims. As should be abundantly clear to the parties from this Court's discussion, however, this decision hardly guarantees that each of the Town's remaining claims will make it to the jury, particularly since the Court has expressed serious

reservations about the Town's TFCA and breach of fiduciary duty claims.

An appropriate Order will enter.

KEVIN H. SHARP
UNITED STATES DISTRICT JUDGE